UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVSION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | 2:17-CR-20108-TGB |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS (DKT. 24), AND SETTING TRIAL DATES** |
| **RANDALL HUGHES**, | |
| Defendant. | |

Defendant Randall Hughes is charged with two counts of possession of cocaine with the intent to distribute it, one count of possession of a firearm in relation to drug trafficking, two counts of being a felon in possession of a firearm, and one count of possession of a stolen firearm (Dkt. 12, Indictment).  Defendant filed a motion to suppress evidence (Dkt. 30), seized as a result of the execution of three sets of search warrants.  Defendant's motion primarily argues that the first warrant – seeking location data from two cell phones – was not supported by probable cause.

Since the second and third warrants[1] were issued based on information gleaned from the first warrant, Defendant contends that the information and evidence collected through the execution of these warrants should all be suppressed as "fruits of the poisonous tree." The Government filed a response (Dkt. 32), and the Court held a hearing on April 18, 2018. At the conclusion of the hearing, the Court directed the parties to file supplemental briefing, which they have now done (Dkts. 34, 35).

For the reasons set forth below, Defendant's motion to suppress is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

In mid-November 2016, Defendant came to the attention of the Drug Enforcement Administration (DEA) based on an anonymous tip posted to the DEA's website www.dea.gov (Dkt. 29, Application for Search Warrant, Pg ID 242 ¶ 7). The tip identified a crack cocaine dealer on Goodell Street in River Rouge, Michigan known as "Randall." The tip also provided a phone number for "Randall" – (313) 303-8045. *Id.*

---

[1] The second warrant authorized placement of a GPS tracking device on a car used by Defendant. The third series of warrants authorized the search of four houses and three cars used by Defendant.

According to the affidavit, after receiving this tip, DEA Special Agent (S/A) Scott Smith contacted a confidential source (CS) who, according to S/A Smith, had knowledge of drug traffickers in the surrounding area. *Id* ¶ 8. S/A Smith stated that he worked with this CS since April 2015 on other investigations, that this CS had previously provided reliable information, had conducted consensually recorded conversations with drug traffickers, and had previously conducted controlled purchases of narcotics. *Id.* S/A Smith stated that information given by this CS had led to the arrest of other drug traffickers, and that he deemed this CS to be reliable. *Id.*

The CS told S/A Smith that Defendant was "one of the largest crack cocaine distributors in the area," and that he distributed crack from a house on Goodell Street in River Rouge, Michigan. *Id.* ¶ 9, Pg ID 242-243. The CS further reported that Defendant distributed drugs from that house, but did not live there. *Id.* The CS further stated that Defendant owned and operated several different vehicles, and that he typically carried a firearm on his person or under the seat of his car. *Id.*

The CS reported that he had known Defendant for several years, had been to the house on Goodell Street on many occasions, and almost

3

always saw Defendant possessing crack in that house.  *Id.* ¶ 10.  Indeed, the CS stated that he had been in the Goodell Street house within the last two weeks, and saw Defendant with crack.  *Id.*  The CS also stated that Defendant typically had 4-5 cell phones at a time.  *Id.* ¶ 11.  The CS reported that Defendant used the number (313) 687-5037 for a long period of time, and used this number to talk with family and close friends.  *Id.*  The CS was not familiar with the telephone number provided by the internet tipster (313-303-8045), but stated that it was likely that Defendant utilized this number to deal drugs, and likely only used it for a brief period of time (in other words, this was a "burner phone").  *Id.*

Based on the information above, on November 23, 2016, S/A Smith submitted an application for a search warrant to Magistrate Judge Mona Majzoub (Dkt. 29).  The warrant sought location data for the two cellular phone numbers described above, for a period of 30 days.  *Id.*  Magistrate Judge Majzoub approved the warrant application.

The phone location data quickly bore fruit.  On November 28, 2016, the location data from Defendant's phones indicated that they were in a 922 meter radius of the 4400 block of Tillman Street in Detroit (Dkt. 28,

4

GPS Search Warrant Application, Pg ID 156 ¶ 14). A search of a "commercially available database" indicated that Defendant was previously associated with a house located in that radius – 3744 24th Street, Detroit, Michigan. *Id.* The DEA staked out that house, and observed a black Chevy Traverse and a tan Buick Enclave parked in the driveway. *Id.* The tan Enclave had a Michigan license plate (DBE7338), and was registered to Amelia Gerlaine Hughes at 93 Walnut Street, River Rouge, Michigan. *Id.* ¶ 15, Pg ID 157. The black Traverse had a Michigan license plate (DGL6629), and was registered to Keinya Marie Powers at the 24th Street address in Detroit where it was observed. *Id.*

On November 29, 2016, the phone location data again showed Defendant in the area of the 24th Street house. *Id.* ¶ 16. Agents watched the house and, at approximately 4:56 p.m., they saw an African American female exit the house, get into the black Traverse, pull out of the driveway, and park in front of the house. *Id.* ¶ 17. Agents then saw an African American male, matching Defendant's general description, exit the house, get into the tan Enclave, and drive away. *Id.* The next packet of phone location data indicated that Defendant had left the area. *Id.*

5

At approximately 5:34 p.m., agents observed the tan Enclave arrive at 260 Goodell Street, River Rouge, Michigan, and park in front of the house. *Id.* ¶ 18, Pg IDs 157-158. Agents saw the same male, matching Defendant's description, exit the tan Enclave and enter the house on Goodell Street. *Id.* The next packet of phone location data indicated that Defendant's phones were in the proximity of the Goodell Street house.

Based on all of the above information, on December 1, 2016, S/A Scott presented an application for a search warrant to Magistrate Judge David Grand (Dkt. 28, Pg ID 150).[2] This warrant sought to place a GPS tracker on the tan Enclave that Defendant was seen driving. Magistrate Judge Grand approved the warrant, for a period of 45 days. *Id.* Pg ID 149. On December 2, 2016, agents placed the GPS tracker on the tan Enclave.

All of the above investigative work led S/A Smith to apply for a set of search warrants, on December 16, 2016, targeting four houses and three vehicles. Magistrate Judge Anthony Patti approved the warrants.

---

[2] This warrant application also reported Defendant's criminal history, including felony convictions for receiving and concealing stolen property (1996) and drunk driving, third offense (2011), as well as a misdemeanor conviction for drug possession (2015) (Dkt. 28, ¶ 19, Pg ID 158).

The application set forth the following facts in support of establishing probable cause as to each location. After each recitation of facts, the evidence seized from that location is listed.

- ❖ **260 Goodell St., River Rouge, Michigan (Main distribution house)**
  - ▪ Anonymous tip to dea.com that "Randall" is dealing crack from this house, tipster also provides Defendant's phone number;
  - ▪ CS states that Defendant is one of the largest crack dealers in the area, and deals drugs from house on Goodell St.;
  - ▪ November 26, 2016, DEA sees Defendant arrive here in tan Enclave;
  - ▪ CS has been inside this house on numerous occasions, observed Defendant in possession of crack on nearly every occasion, has seen Defendant "cooking" crack here;
  - ▪ CS states that Goodell house is Defendant's primary crack distribution location;
  - ▪ CS frequently sees Defendant with a gun at Goodell house, sometimes on kitchen counter
  - ▪ CS states that Defendant does not reside at Goodell house, but "Chuck and Jody" do, CS has seen them test the quality of the crack;
  - ▪ CS has seen Defendant instruct "Chuck" to deliver crack to customers from this location;
  - ▪ CS has seen Defendant with crack in this house within 2 weeks of warrant application;
  - ▪ On hidden camera video taken on December 4, 2016 – Defendant is seen getting out of black GMC Yukon and entering house, carrying a plastic bag.
  - ➢ *Recovered a stolen firearm (Sig Sauer P226, 9 mm), and a makeshift crack cooking lab*

7

❖ **3744 24th St., Detroit, Michigan (Defendant's residence)**
- November 28, 2016, target phones ping near house;
- Three cars (identified below) regularly parked at the house;
- Black GMC Yukon registered to Keinya Marie Powers (Defendant's girlfriend) seen here;
- Silver Chevy Traverse registered to Ms. Powers seen here;
- November 26, 2016, DEA sees Defendant leave residence in tan Buick Enclave (drives to Goodell St.);
- GPS tracker on tan Enclave shows car frequently arriving in the early morning hours, and departing in the afternoon;
- GPS tracker showed tan Enclave travelling to Goodell and Walnut houses nearly every day;
- The warrant application also states that "In addition, I am aware that the courts have recognized that, with respect to drug dealers, evidence of their involvement in the drug trade is likely to be found where the dealers reside, even if no drug trafficking was observed to occur there. *See United States v. Whitner*, 288 F.3d 91, 103 (3d Cir. 2000); and *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (in drug cases, evidence is likely to be found where drug dealers reside)" (Dkt. 28, Ex. 6, Pg ID 214).

  ➤ *Recovered 47.5 grams of crack cocaine, ~$44,000, a handgun (Smith & Wesson .40 caliber), and drug ledgers*

❖ **93 Walnut St., River Rouge, Michigan (Defendant's parents' house)**
- Walnut Street address is billing address for Target telephones 1 & 2, which list Defendant's name as the account holder;
- Tan Buick Enclave, registered to Amelia Gerlaine Hughes, seen parked here;
- CS has been to Walnut Street address, has seen Defendant conducting crack deals here;
- CS states that Defendant refers to Walnut Street address as his mother's or father's house;

8

- CS observed Defendant conduct multiple crack deals within two weeks of application in front of this house;
- CS positively identifies picture of Defendant's father, listed as an occupant of Walnut Street house;
- On December 1, 2016, DEA agents observed Defendant conduct a suspected drug transaction here – Defendant exits Walnut Street house, gets into passenger side of grey sedan, shortly after, Defendant exits, gets into tan Buick Enclave and both cars drive off;
- GPS tracker shows tan Buick Enclave frequently at Walnut address.

  ➢ *Recovered two firearms, and "distribution amounts" (the Complaint doesn't specify the quantity) of crack*

- ❖ **58 E. Auburn Ave., River Rouge, Michigan (Lamar Lemon's house)**
  - CS identified "Droop" (Lamar Lemon) as a distributor of crack for Defendant;
  - CS states that Lemon resides at Auburn Ave. address, and deals crack from there;
  - CS has seen Defendant deliver crack to Lemon at Auburn address;
  - CS has personally witnessed Lemon conduct drug transactions at address;
  - CS observed Defendant delivering firearms to Lemon to Auburn house for storage in Lemon's safe.

  ➢ *Recovered $17,500, and small amount of crack*

- ❖ **Tan Buick Enclave**
- ❖ **Black GMC Yukon**
- ❖ **Silver Chevy Traverse**
  - CS states that he has seen Defendant use these cars to travel to drug transactions;
  - CS stated that Defendant almost always has a firearm under the seat of these vehicles;

9

- Following the December 1, 2016 suspected drug transaction at Walnut Street, Defendant got back into tan Enclave and drove off;
- GPS tracker showed tan Enclave travelling to Goodell and Walnut houses nearly everyday
- December 4, 2016, Defendant observed driving GMC Yukon to Goodell Street, parked and then observed entering house carrying a plastic bag

➢ *Unclear what evidence was recovered from vehicles*

The above summaries show that the facts supporting probable cause differ as to each location. At the conclusion of oral argument on Defendant's motion, the Court indicated that it appeared that the first two warrants (for the location data of two cellular phones, and for the GPS tracker on the tan Enclave) were adequately supported by probable cause. The Court also indicated that the facts set forth in the affidavit relating to three of the four houses were sufficient to establish probable cause as to those three houses. The question was whether the affidavit contained enough evidence to establish probable cause to search the house identified as Defendant's residence, 3744 24th Street, Detroit, Michigan, and for the vehicles. The Court requested that the parties submit supplemental briefing concerning Defendant's residence, paying particular notice to the recent Sixth Circuit case of *United States v. Brown,* 828 F.3d 375, 377 (6th Cir. 2016).

10

## ANALYSIS

Defendant seeks to suppress all evidence seized during the December 2016 searches of four houses and three vehicles on the grounds that the affidavits offered in support of the search warrants failed to set out facts sufficient to establish probable cause.  Defendant's motion also contends that the affidavit failed to establish the reliability of the confidential informant.  At the conclusion of oral argument, Defendant's focus shifted to primarily challenging the search of his residence.

### A. Probable Cause

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV. The "chief evil" deterred by the Fourth Amendment is the physical invasion of the home.  *Payton v. New York*, 445 U.S. 573, 585 (1980); *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003).  Indeed, the right of a citizen to retreat into the home and "there be free from unreasonable governmental intrusion"

11

stands at the core of the Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).  "One of the touchstones of the reasonableness requirement is that the police must generally obtain a warrant based upon a judicial determination of probable cause before entering the home." *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008).  The job of the magistrate judge presented with a search warrant application is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  "There must, in other words, be a nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (internal quotation marks omitted).

Although the court is "limited to examining the information contained within the four corners of the affidavit," *United States v. Dyer,* 580 F.3d 386, 390 (6th Cir. 2009), line-by-line scrutiny of the underlying affi-

davit is improper when reviewing the issuing judge's probable cause determination. *See United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc).

### *i. The Reliability of the Confidential Source*

Defendant's primary challenge to the reliability of the confidential informant is that the information he or she provided to the DEA lacked any corroboration.  For instance, Defendant notes that, prior to applying for the first warrant, the CS did not conduct any "controlled buy;" there was no surveillance conducted on Defendant; there was no secondary source corroborating the information given by the CS; and there was no attempt to remove garbage from any of the residences to uncover evidence of drug paraphernalia.  These arguments are not sufficient to overcome the other facts contained in the affidavit which support a finding of reliability.

Where an affidavit relies heavily upon information from a confidential source, "a court must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances analysis." *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2006).  "As long as the issuing judge can conclude independently that the

13

information is reliable, an affidavit based on the informant's tip will support a finding of probable cause." *United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005); *see United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004) ("an affidavit that supplies little information concerning an informant's reliability may [still] support a finding of probable cause, under the totality of the circumstances, if it includes corroborating information").

Here, two tips led to the issuance of the first in a chain of warrants. First, an anonymous tipster contacted the DEA through its website, stating that a "Randall" was dealing crack from a residence on Goodell Street in River Rouge, Michigan.  The tipster also provided a telephone number for "Randall."  This information was corroborated by the CS, with whom S/A Smith had worked with successfully in the past on prior drug investigations.  Ultimately, the totality of the circumstances here lead to the conclusion that the information provided by the CS was reliable.  The CS previously worked with DEA agents, and the agents found him or her to be trustworthy.  Thus, the CS had a proven record of reliability.  The tips provided by the CS were verified by independent investigation, showing

14

that the CS's information was reliable because it was accurate.  For instance, the telephone number provided by the CS as Defendant's personal "friends and family" was shown to be registered to Defendant.    The corroboration of the CS's information, combined with his prior proven record of reliability in other investigations for the DEA, support a finding of reliability.  Defendant's challenge to the reliability of the CS is therefore not well-taken.

### ii)   The Sufficiency of the Affidavit in Establishing Probable Cause

The Court next considers the validity of the warrants for the four houses and three vehicles.  In this case, a single affidavit was used in support of all seven search warrants.  Yet, the Court must review each warrant individually to make a determination as to whether the facts set out in the affidavit establish a "fair probability that contraband or evidence of a crime will be found" in each of the seven particular places sought to be searched.  *Gates*, 462 U.S. at 238, 103 S.Ct. 2317.  As Court stated after the oral argument on this motion, the facts in the affidavit clearly established probable cause that evidence would be found at three out of the four houses – 260 Goodell, River Rouge, Michigan; 93 Walnut Street, River Rouge, Michigan; and 58 E. Auburn Avenue, River Rouge,

15

Michigan.  As to each of these locations, the CS provided first-hand information that he had seen or was aware of Defendant engaging in drug-related activities on the premises.

As to the Goodell Street address, the CS stated that he had been in this house on numerous occasions with Defendant, and "almost every time observed [Defendant] in possession of crack cocaine."  The CS also stated that he observed Defendant "cooking" powder cocaine into crack cocaine at this house.  The CS observed a firearm on the kitchen counter when Defendant was cooking cocaine.  The CS stated that Defendant does not live at this address, but that "Chuck" and "Jody" do; the CS observed Defendant directing Chuck and Jody to conduct drug deals and saw Defendant give them crack cocaine to test its quality.   A database search confirmed that a Charles and Jody Redley lived at this house, corroborating the information given by the CS.  Investigators also staked out this house, and saw Defendant arriving here and entering the house.  Furthermore, the GPS tracker on the tan Enclave showed Defendant travelling to this house nearly every day between December 2-11, 2016.  Finally, a covertly installed camera recorded Defendant entering this house

on December 4, 2016, carrying a plastic bag.  The totality of these circum-
stances gave rise to adequate probable cause to justify the search of the
Goodell Street house.

As to Walnut Street, the CS also personally observed Defendant
conducting crack cocaine transactions at this location.  The CS stated
that Defendant referred to this house as his "mother's house" or his "dad's
house."  The CS stated that Defendant's mother was deceased, and public
databases confirmed this information, thus corroborating the CS's state-
ments.  The phone numbers associated with Defendant were registered
in Defendant's name at this address.  On December 1, 2016, S/A Smith
personally observed Defendant conducting a suspected drug deal at this
address.  This information was sufficient to justify the search of this
house.

The same level of personal knowledge by the CS was demonstrated
regarding 58 E. Auburn Avenue. The CS reported that "Droop" (identified
by his state ID picture as Lemar Lemon) dealt crack cocaine from this
house on Defendant's behalf.  The CS saw Defendant deliver distribution
quantities of crack to Lemon at this house, and also witnessed Lemon sell
crack from the house.  The CS stated that he also saw Defendant deliver

17

a gun to Lemon at this house, to store in Lemon's safe. This information was sufficient to justify the search of this house.

Regarding Defendant's residence—3744 24th Street, Detroit, Michigan—the CS had no personal knowledge, or even second-hand knowledge, of the presence of drugs or drug-trafficking at this location. The warrant application for this house begins by noting that Defendant's cell phones frequently pinged as being near this house, and that Defendant's vehicles were often parked in the driveway (Dkt. 28, Ex. 2, ¶ 33, Pg ID 223-224). The application next notes that the black Yukon and the silver Traverse are registered to Keinya Marie Powers at this house, and that agents believe that Ms. Powers is Defendant's girlfriend. *Id.* ¶ 34. On November 29, 2016, agents observed a male, who they believed to be Defendant, exit the house, get into the tan Enclave and drive away. Shortly thereafter, agents saw Defendant pull up to Goodell Street, exit the tan Enclave, and enter the house. On December 2, 2016, S/A Smith installed the GPS tracker on the tan Enclave, which was then parked in front of the 24th Street residence. The GPS tracker showed the tan Enclave at 24th Street every day during the period of December 2-11, 2016,

typically arriving in the very early morning and staying until the afternoon.  *Id.* ¶ 38.  The affidavit also states that the tan Enclave frequently visited the Goodell and Walnut Street houses, but only contains one instance of Defendant driving from 24th Street directly to Goodell.  In ¶ 35, agents observed Defendant leave 24th Street at 4:56 PM, and arrive at Goodell at 5:34 PM.  The affidavit then states:

> Based on these facts, I believe [3744 24th Street] is the primary residence of [Defendant].  As explained in [paragraphs] # 7 and #8, based on my training and experience and the training and experience of other law enforcement partners, evidence of drug trafficking can typically be found in a drug traffickers' primary residence.  As explained in paragraph #9, the courts have also recognized that, with respect to drug dealers, evidence of their involvement in the drug trade is likely to be found where the dealers reside, even if no drug trafficking was observed to occur there.  *Id.* ¶ 39, Pg ID 226.

As noted above, ¶ 9 of the affidavit cites two opinions from the United States Court of Appeals for the Third Circuit: *United States v. Whitner*, 288 F.3d 91, 103 (3d Cir. 2000) and *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002), cited in support of the proposition that in drug cases, evidence is likely to be found where drug dealers reside.  Viewing the corpus of facts pertaining to the 24th Street address, combined with the totality of the evidence contained in the affidavit concerning Defendant's activities, the Court must consider whether there was sufficient evidence

19

to establish probable cause that evidence of drugs or drug trafficking would be found there.

In a recent Sixth Circuit case, the Court held that "if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." *United States v. Brown*, 828 F.3d 375, 384 (6th Cir. 2016).

As in *Brown*, the search warrant affidavit for the 24th Street residence "contain[s] no evidence that [Defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there." *Id.* at 382. Here, the facts in the affidavit relating to the 24th Street address tend to establish that it was Defendant Hughes' residence. As to this point, the facts established a fair probability that it was true. But as to any connection to drugs and drug trafficking, the affidavit virtually acknowledges that something is missing when it relies on the assertion that "evidence of [drug dealers'] involvement in the drug trade is likely to be found where the dealers reside, even if no drug trafficking was observed to occur there." The Court of Appeals in

*Brown* pointed out that the affidavit in that case did not include any statement by a confidential source that he had purchased drugs in the home, and that neither surveillance nor any recorded conversations linked drug trafficking to the suspect's residence.  *Id*.  The same is true of the affidavit for 24th Street.  The CS in this case had never seen drug trafficking there, nor did he ever indicate that Defendant kept a gun in his home (although the CS stated that Defendant kept a gun under the seat of his car).

In rejecting the government's assertion in *Brown* that the magistrate judge could infer from the fact that the defendant was a drug dealer that drugs would be located at the place where he lived., *Brown* explained that "status as a drug dealer" plus "some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence" is required to find a sufficient nexus for probable cause purposes. *Id*. at 383. Specifically, the *Brown* court explained that "we have required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." *Id*.  Here, the record is devoid of any evidence, much less reliable evidence, that Defendant used his residence for drug dealing.

21

The CS had demonstrated knowledge and experience of Defendant's drug-dealing behavior, but the CS never claimed that Defendant engaged in drug trafficking from his home or witnessed him sell drugs near his home. The facts in this case are impossible to distinguish from *Brown*, with is binding precedent, so the Court similarly concludes that there was not adequate probable cause to search Defendant's home.

Because they were cited in the affidavit itself, the Court will also address the Third Circuit cases mentioned above, which are not binding precedent. A review of these cases reveals that their facts are distinguishable because both *Whitner* and *Burton* involved additional evidence of suspicious activity occurring at the defendants' homes, namely, that the defendants equivocated in response to agents' questioning about their relationship to the homes at issue and, in *Whitner*, the defendant referred agents to a convicted drug dealer to answer any questions about the apartment that was the target of the search. The Third Circuit held that these "attempt(s) at concealment," combined with the defendants' statuses as known drug dealers, logically suggested that contraband might be located in the homes. *See United States v. Whitner*, 219 F.3d 289, 299 (3d Cir. 2000); *see also United States v. Burton*, 288 F.3d 91, 104–05 (3d

22

Cir. 2002) (the "affidavit relates that [the defendant] was evasive about telling the Task Force his address. His equivocation under questioning on a subject [the defendant] presumed to know readily suggests he was attempting to deceive the Task Force of his true address, thereby supporting the inference that contraband was hidden there"). In the instant case, the affidavit contains no such additional suspicious behavior by the Defendant, such as being cagey to agents about the location of his residence.

Moreover, to the extent that *Whitner* and *Burton* provide authority for the proposition relied upon in the affidavit ("that, with respect to drug dealers, evidence of their involvement in the drug trade is likely to be found where the dealers reside, even if no drug trafficking was observed to occur there") this proposition conflicts with the Sixth Circuit's decision in *Brown,* which of course governs the conduct of federal law enforcement agencies in the Sixth Circuit, in which the City of Detroit lies.

Under the Fourth Amendment, no warrants may issue except upon probable cause. If the affidavit's facts pertaining to 24th Street were insufficient to establish a connection between Defendant's drug trafficking and the location, then the warrant was issued in violation of the Fourth

Amendment, and the question then becomes whether the evidence must be excluded under the exclusionary rule, or whether it may be allowed because was the officers seized it in good-faith reliance on an outwardly valid search warrant.

### B. The Good Faith Exception

The government argues that even in the event that probable cause may have been lacking, the search was still constitutionally permissible under the good-faith doctrine articulated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405 (1984).  Under the good faith exception, the exclusionary rule will not apply to bar the admission of evidence seized in violation of the Fourth Amendment where the officers had a "good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996).  The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances ... may be considered." *Leon*, 468 U.S. at 922–23 n. 23, 104 S.Ct. 3405.

24

The good-faith defense will not apply, however, where: "1) the supporting affidavit contains information the affiant knew or should have known is false; 2) the issuing magistrate lacked neutrality and detachment; 3) the affidavit is devoid of information that would support a probable cause determination making any belief that probable cause exists completely unreasonable; or 4) the warrant is facially deficient." *United States v. Czuprynski*, 46 F.3d 560, 563–64 (6th Cir. 1995) (citing *Leon*, 468 U.S. at 923, 104 S.Ct. 3405), opinion supplemented by 65 F.3d 169 (6th Cir. 1995). With respect to the third exception, courts will not find good faith where the affidavit is merely a "bare bones" document. *See U.S. v. Leon*, 468 U.S. 897, 914–15, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). A "bare bones" affidavit is one "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923, 104 S.Ct. 3405. Such affidavits "state[ ] suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge ...." *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996). To determine the applicability of the good-faith doctrine, the Supreme Court has held that courts

25

should balance the culpability of the law enforcement conduct against the

costs of excluding relevant, inculpatory, evidence:

> The basic insight of the *Leon* line of cases is that the deterrence
> benefits of exclusion "var[y] with the culpability of the law enforce-
> ment conduct" at issue. *Herring*, 555 U.S., at 143, 129 S.Ct. 695.
> When the police exhibit "deliberate," "reckless," or "grossly negli-
> gent" disregard for Fourth Amendment rights, the deterrent value
> of exclusion is strong and tends to outweigh the resulting costs. *Id.*,
> at 144, 129 S.Ct. 695. But when the police act with an objectively
> "reasonable good-faith belief" that their conduct is lawful, *Leon*, su-
> pra, at 909, 104 S.Ct. 3405 (internal quotation marks omitted), or
> when their conduct involves only simple, "isolated" negligence, *Her-
> ring*, supra, at 137, 129 S.Ct. 695, the "'deterrence rationale loses
> much of its force,'" and exclusion cannot "pay its way." *See Leon,
> supra*, at 919, 908, n. 6, 104 S.Ct. 3405 (quoting *United States v.
> Peltier*, 422 U.S. 531, 539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975)).

*Davis v. United States*, 564 U.S. 229, 238, 131 S. Ct. 2419, 2427–28

(2011).

The Sixth Circuit recently opined on the applicability of the good

faith exception in the context of a search of a drug dealer's residence.  In

*United States v. White*, 874 F.3d 490, 493 (6th Cir. 2017), the district

court held that a search warrant affidavit lacked probable cause, but did

not ultimately suppress the evidence because of the good faith exception.

On appeal, the Sixth Circuit did not consider the probable cause issue,[3] but affirmed the district court's application of the good faith doctrine. *White* held that the affidavit at issue was not the type of "bare bones" affidavit as contemplated by *Leon*.

In this case, the balance of deterrence of law enforcement overreach against the cost to society of suppressing evidence leads to concluding that the good faith exception does not apply.  First, the Court is concerned that the affidavit chose to rely on two Third Circuit cases, each over 15 years old, rather than on the Sixth Circuit's decision in *Brown,* which was on point and contrary to the two Third Circuit decisions.  Indeed, the *Brown* case was decided on June 27, 2016, and the affidavit at issue was submitted to the Magistrate Judge on December 16, 2016 – less than 6 months later.  Furthermore, the *Brown* case arose from an investigation also conducted by the Detroit office of the DEA, so that it is reasonable to expect that the agency was aware that the Sixth Circuit's decision in *Brown* governed facts similar to those presented in the affidavit of this

---

[3] This issue went undecided, because the "government [did] not challenge the district court's probable-cause ruling, arguing instead that the affidavit plainly qualifies for the good-faith exception."  *White*, 874 F.3d at 495.

case. The agents in this case should have been aware of the *Brown* decision, and its implications for searches of drug dealer's homes. As noted earlier, the Court finds that the searches of the other three houses were adequately supported by probable cause. In terms of weighing the impact of a finding that the good faith exception does not apply, and that the evidence from 24th Street must be excluded, such a decision would not mean that Defendant could not be prosecuted. Additional evidence of drug trafficking was found at the other locations.

The Court notes that a recent published decision from the Sixth Circuit supports the conclusion that the good-faith exception should not apply. In *United States v. Christian*, --- F.3d ---, No. 17-1799, 2018 WL 3121232 (6th Cir. June 26, 2018), the Court held that a search warrant for a drug dealer's residence was not supported by probable cause. Interestingly, the evidence supporting the search and connecting the residence to drug trafficking in *Christian* was arguably greater than it is in the present case. Specifically, the affidavit in *Christian* stated that prior warrants executed at the defendant's house (in 2009 and 2011) led to the defendant's arrest for "maintaining a drug house;" that the defendant had numerous prior arrests for drug-related crimes, spanning a nineteen-

year period; that a confidential information identified the defendant as a drug dealer in December 2014; that a controlled buy of drugs was conducted at the defendant's house (in January 2015 – eight months before the warrant in question); that "within the last four months" several other unnamed informants identified the defendant as a large scale drug dealer; and that on September 3, 2015 (the date the warrant was applied for and issued), an individual was seen walking away from the "area" of the defendant's house and, shortly thereafter, was arrested in possession of 20 grams of heroin.  *Id.* at *1-2.  Despite this evidence of some drug connection to the house, the Sixth Circuit ruled that the warrant was not supported by probable cause, and that the good-faith exception did not apply.  Here there is even less evidence connecting Defendant's residence to drug trafficking: the facts show Defendant's regular presence at his house, the regular presence there of his vehicles, and that his vehicle travelled from there to two houses where drugs were found. These facts merely establish a likelihood that Defendant lives there and perhaps a possibility that drugs could be being transported from there to the other locations.  But as the Sixth Circuit made clear in *Brown*, "[t]he connection

between the residence and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" 828 F.3d at 382. The fact that Defendant is a drug dealer—who lives in a particular location—has been discredited by *Brown* as allowing an inference that there is a likelihood drugs will be found at the drug dealer's residence. So what is missing from the affidavit is any evidence connecting Defendant's house to drug dealing.

Ultimately, *Christian* reviewed the Sixth Circuit's precedents on the good-faith doctrine, and determined that the good-faith exception should not apply. In reaching this result, the Court stated that "[t]here [was] no evidence in the affidavit that [the police] engaged in ongoing or repeated surveillance, arranged subsequent controlled buys, or otherwise monitored for 'hallmarks of drug dealing' at the Residence. By suppressing the evidence in this case, we will incentivize the police to take such corroborative action in the future." *Christian* at *20 (internal citations omitted). The *Christian* court's statement applies well to this case: "[w]hether the good-faith standard is met is a close call in this case, but ultimately we conclude that the affidavit falls short because it does not

provide any 'particularized facts' connecting the Residence to drug activity at the time that the search warrant was executed." *Id.* at 18.  Similarly, in this case, there is no evidence set forth in the affidavit directly tying Defendant's home to drug trafficking.

For these reasons, the Court finds that the evidence collected from Defendant's residence must be suppressed, and that the good faith exception does not apply.

## CONCLUSION

For the reasons set forth above, Defendant's motion to suppress (Dkt. 24) is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** with respect to the evidence collected from Defendant's home (3744 24th Street, Detroit, Michigan) and that evidence is hereby **SUPPRESSED**.  The motion is **DENIED** in all other respects.

Accordingly, the Court sets the following dates in this matter:

PRETRIAL CONFERENCE:        August 20, 2018 at 3:00 PM
TRIAL:                                  September 11, 2018 at 9:00 AM

The Court finds that additional time is necessary for parties to reasonably prepare for trial, and that the additional time shall be deemed excludable delay under the provisions of the Speedy Trial Act, 18 U.S.C. § 3161. Pursuant to Section 3161(h)(7)(A), the ends of justice served by continuing these dates outweigh the best interests of the public and defendant in a speedy trial. Failure to grant the continuance would deny counsel for the defendant the reasonable time necessary for effective preparation, taking into account the exercise of due diligence. *See* 18 U.S.C. §3161(7)(B)(iv).

Accordingly, the trial will be set for September 11, 2018 and that under the Speedy Trial Act, 18 U.S.C. § (h)(7)(A), the period of delay resulting from this continuance shall be excluded in computing the time within which the trial must commence.

IT IS ORDERED that the period from the date of this Order, August 7, 2018 to the new trial date of September 11, 2018 shall be excluded from computing the time within which the trial must begin under the provisions of the Speedy Trial Act, 18 U.S.C. § 3161.  The Court finds that an extension of these dates serves the ends of justice by allowing defense counsel time to interview potential witnesses and prepare for trial, and

32

allowing the parties the opportunity to engage in plea negotiations. The Court finds that the ends of justice served by the granting of such an adjournment will outweigh the best interests of the public and the defendants in a speedy trial.  18 U.S.C. § 3161(h)(7)(A).

**SO ORDERED**.

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  August 7, 2018

## Certificate of Service

I hereby certify that this Order was electronically submitted on August 7, 2018, using the CM/ECF system, which will send notification to each party.

s/A. Chubb
Case Manager

33